**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS**


**DENNIS THOMPSON,** )
**No. B-67474,** )
        **Plaintiff,** )
         )
**vs.** )     **Case No. 17−cv–843-SMY**
         )
**MISTY THOMPSON,** )
**NURSE TRIPP,** )
**JANE DOE,** )
**C/O HOFFMAN** )
**JACQUELINE LASHBROOK, JOHN
TROST, and
BRETT MILLER,**

        **Defendants.**

<u>**MEMORANDUM AND ORDER**</u>

**YANDLE, District Judge:**

Plaintiff Dennis Thompson, an inmate at Menard Correctional Center ("Menard"), brings this action for deprivations of his constitutional rights pursuant to 42 U.S.C. § 1983. Plaintiff claims that officials at Menard (1) were deliberately indifferent to his serious medical condition (degenerative joint/disc disease and associated symptoms); (2) retaliated against him for engaging in protected activity (filing lawsuits and grievances); (3) subjected him to cruel and unusual punishment; and (4) engaged in improper conduct in relation to a settlement agreement in another civil rights lawsuit. In connection with his claims, Plaintiff sues Misty Thompson (a nurse); Nurse Tripp (a nurse); Jane Doe (a nurse); C/O Hoffman (a correctional officer); Jacqueline Lashbrook (Menard's warden); and John Trost (a physician). Plaintiff seeks monetary compensation and injunctive relief.

This case is now before the Court for a preliminary review of the Second Amended Complaint (Doc. 11) pursuant to 28 U.S.C. § 1915A, which provides:

(a) **Screening** – The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.

(b) **Grounds for Dismissal** – On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint–

(1) is frivolous, malicious, or fails to state a claim on which relief may be granted; or

(2) seeks monetary relief from a defendant who is immune from such relief.

An action or claim is frivolous if "it lacks an arguable basis either in law or in fact." *Neitzke v. Williams*, 490 U.S. 319, 325 (1989). Frivolousness is an objective standard that refers to a claim that any reasonable person would find meritless. *Lee v. Clinton,* 209 F.3d 1025, 1026-27 (7th Cir. 2000). An action fails to state a claim upon which relief can be granted if it does not plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The claim of entitlement to relief must cross "the line between possibility and plausibility." *Id*. at 557. At this juncture, the factual allegations of the *pro se* complaint are to be liberally construed. *See Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 821 (7th Cir. 2009).

## Procedural Background and Pending Motions

Plaintiff filed his original Complaint (Doc. 1) on August 7, 2017. Before the Court could complete a preliminary review of the original Complaint, Plaintiff filed a Motion for Leave to File an Amended Complaint (Doc. 5-2), accompanied by an amended complaint (Doc. 5) and a Motion to Stay the Court's Merit Review (Doc. 7). Thereafter, Plaintiff filed a Motion for Leave to File a Second Amended Complaint. (Doc. 9).

On October 30, 2017, the Court granted the Motion for Leave to File a Second Amended Complaint. (Doc. 10).

Accordingly, the Court DENIES Plaintiff's previous Motion to Amend (Doc. 5-2) and Motion to Stay (Doc. 7) as MOOT. The Court proceeds with a merits review of the Second Amended Complaint. (Doc. 11).

## THE SECOND AMENDED COMPLAINT

### *Background*

Plaintiff has been diagnosed as being morbidly obese (weighing over 300 pounds) and having degenerative joint/disc disease ("DJD") in his shoulders, knees, hip and the entire length of his spine. (Doc. 11, pp. 7, 19; Doc. 11-1, pp. 2-5). He has a narrowing of the spinal disc at L3-4, L4-5 and L5-s1. *Id.* The DJD in Plaintiff's right hip is particularly severe, involving hip dysplasia with a marked decrease in range of motion. *Id.*

Plaintiff has previously filed civil rights lawsuits and/or grievances against staff at Menard including, Defendants Trost, Tripp and Thompson. (Doc. 11, pp. 12, 15-16, 19, 22).[1] The lawsuits and/or grievances have involved, among other things, claims related to Plaintiff's obesity. *Id*. According to the Second Amended Complaint, at least one lawsuit has resulted in an agreement to have Plaintiff exercise as much as possible in order to lose weight. (Doc. 11, p. 19). One of Plaintiff's earlier filed civil rights actions is still pending in the Southern District of Illinois. *See Thompson v. Illinois Department of Corrections et al.,* 3:15-cv-850-NJR-DGW (hereinafter, "*Thompson v. IDOC*").

### *February 29, 2016 – Thompson Refuses to Provide Ibuprofen*

Because of his severe DJD, Plaintiff takes anti-inflammatory medication (ibuprofen) on a regular basis. (Doc. 11, p. 12). At times, HCU employees are unable to refill Plaintiff's ibuprofen

---

[1] The Court located the following previously filed actions: (1) *Thompson v. Nwaobasi et al*., 3:12-cv-770-MJR-PMF (judgment entered and case closed on August 23, 2016, Docs. 213 and 214); (2) *Thompson v. Tourville et al.,* 3:13-cv-333-NJR-DGW (judgment entered and case closed on March 30, 2015, Docs. 151 and 152); and (3) *Thompson v. Illinois Department of Corrections et al.,* 3:15-cv-850-NJR-DGW (pending).

in a timely manner. *Id.* In the past, medical staff would simply provide Plaintiff with a small number of ibuprofen pills from the medical stock supply to hold Plaintiff over until his refill arrived. However, after Plaintiff filed one or more lawsuits, things changed. *Id.*

On February 29, 2016, Plaintiff's medical appointment with Trost was cancelled. *Id.* As a result, Plaintiff did not receive his ibuprofen refill. *Id.* Plaintiff told Thompson he was out of ibuprofen and was in extreme pain. *Id.* As he had in the past, Plaintiff requested ibuprofen from the medical stock supply. *Id.* Thompson told Plaintiff that his appointment was cancelled because "people like you" keep filing lawsuits and Trost has to appear for depositions. *Id.* She then said, "Tell me why I should go out of my way to give you anything when Dr. Trost is like the third medical staff member you have sued…I'm not giving you nothing." *Id.* As a result, Plaintiff was without ibuprofen for several days and was in extreme pain. *Id.*

### *Harassment by Thompson*

Thompson regularly harassed Plaintiff from February 2016 until she left her employment with Menard. (Doc. 1, p. 14). She would say things like "that's the fat ass who filed a law suit because he ate like a hog and gained weight. He states it's our fault." *Id.* On one occasion, when Plaintiff was waiting for a medical appointment, he asked if he could be seen sooner rather than later. *Id.* Thompson intervened stating "no, no, no that's the one I've been telling you about. He's suing the medical director Trost because he ate like a hog and got fat." *Id.* Prisoners and Menard employees laughed in response. *Id.* Thompson also said "I'll knock his fat ass out he can't barely stand any way with his hip and fat ass belly. I can take one finger and push him and he'll tilt over and be stuck on his back like a turtle." *Id.* An officer then yelled, "I've fallen and I can't get up." *Id.*

In addition, Thompson regularly woke Plaintiff early in the morning and any time he was napping. (Doc. 1, p. 15). She would wake him with taunts regarding his weight (telling him to get his "fat ass" up) and by referencing his lawsuits ("you say you want to lose weight and we not doing our JOB – get up, get up, am I doing my job now?). *Id.*

### November and December 2016 – Delay and/or Denial of Medical Care

In approximately November 2016, the DJD in Plaintiff's spine and right hip worsened. (Doc. 11, p. 7). He experienced a severe arthritic flair up and submitted two separate sick call requests. *Id*. Both requests went unanswered. *Id.* By December 2016, Plaintiff was experiencing continuous severe muscle spasms in his pelvic/hip area down to his thigh and knee. *Id*. He had fluid buildup (edema) in his waist, was in severe pain and was unable to control his bowels and bladder. *Id*. He defecated and urinated on himself, his bedding and the floor of his cell. *Id*. Even when Plaintiff was able to reach the toilet in his cell, the severe muscle contractions would cause him to defecate and/or urinate on himself. (Doc. 11, pp. 7-8). The muscle spasms and pain prevented Plaintiff from cleaning up after himself. (Doc. 11, p. 8). He sometimes fell on the concrete floor while trying to clean, causing further injury. *Id*.

In the first week of December 2016, Plaintiff told Thompson, Tripp and Jane Doe about his worsening condition. (Doc. 11, p. 7). He "thoroughly explained" his symptoms to each defendant and showed them medical paperwork confirming his medical condition. (Doc. 11, pp. 7-8). These individuals had prior knowledge of Plaintiff's medical condition because they attended some of his medical appointments. (Doc. 11, p. 8). Plaintiff also explained that he had no pain medication because his ibuprofen refills were late and that he had been missing showers and meals due to his condition. *Id.* Plaintiff indicated that his sick call requests had gone unanswered and asked Thompson, Tripp and Jane Doe to transport him to the HCU for a medical

emergency. *Id.* Jane Doe told Plaintiff she only directed "walk in" escorts to the HCU if a prisoner is having chest pains. (Doc. 11, p. 9). Plaintiff asked Jane Doe to submit an emergency sick call on his behalf. *Id.* She refused because Plaintiff was not having chest pains. *Id.* She also refused to give Plaintiff pain medication. *Id.*

At one point, an officer asked Thompson to examine Plaintiff because he believed Plaintiff was experiencing a medical emergency. (Doc. 1, p. 7). Thompson refused to help Plaintiff. She told him, "you know I'm not doing that for you …you need to think about these things before you start suing the very people you need to give you treatment especially the way you're breaking down." (Doc. 11, p. 9). She declined to give Plaintiff pain medication and turned to the officer that called her down and said, "I wish you had told me it was this fucker who be suing everybody was the prisoner in distress before I walked downstairs to his cell…that's all his fat ass does is sit around and file grievances and suits on the staff I'm not giving him shit." *Id.*

When Plaintiff asked Tripp for help, she told him the HCU employees were having a series of Christmas parties and were only taking a few sick calls. (Doc. 1, p. 9). She refused to direct security staff to escort him to the HCU and would not accept a sick call request from him. *Id.* She did agree to bring Plaintiff pain medication later in the day. *Id.* However, when she returned, she had forgotten the medication and told Plaintiff she was too tired to make another trip. (Doc. 11, p. 10). Plaintiff made a critical comment regarding the Christmas parties and told Tripp she was his last hope because the other nurses were also refusing to help him. *Id.* Tripp responded, "I did not tell you to file those lawsuits or to insult me just now, did I. It seems the suits you filed are coming back to bite you in the ass huh." (Doc. 1, p. 10). She then said, "You need to stop with the grievances and lawsuits because I or no one else is ever going to help you." *Id.*

Plaintiff remained in this condition, suffering without medical treatment for two or three weeks. (Doc. 11, pp. 10-12). On December 9, 2016, on his way to the showers (Plaintiff had not showered in three weeks), Plaintiff collapsed. (Doc. 11, p. 10). The gallery officer called for assistance and told his sergeant that Plaintiff had been seeking treatment for two weeks. (Doc. 11, pp. 10-11). He said, "medical is taking it to[o] far now whether he has filed suits or not." (Doc. 11, p. 11). The sergeant then radioed for a wheel chair. *Id.*

Nurse Tripp eventually arrived on the scene. *Id.* She did not examine Plaintiff or ask him any questions. *Id.* Instead, she told security staff "he crapped on himself. I'm not touching him." *Id.* Other prisoners helped Plaintiff into the wheelchair and security staff wheeled Plaintiff to the HCU. *Id.* A nurse practitioner treated Plaintiff. *Id.* The nurse practitioner and other medical staff cleaned feces and urine off of Plaintiff. *Id.* He was treated with muscle relaxants and hot towels. *Id.* The nurse practitioner expressed surprise when she learned Plaintiff had been denied treatment for two or three weeks. *Id.* She indicated that his medical records "speak volumes," that his symptoms are consistent with his diagnosed conditions and that he could not be faking the symptoms. (Doc. 11, pp. 10-11). After Plaintiff was stabilized, the nurse practitioner scheduled a follow-up appointment with Trost. (Doc. 11, p. 12). Due to the severity of Plaintiff's condition, she issued additional medical authorizations regarding Plaintiff's cell, as well as shower and meal time authorizations. *Id.* She also provided Plaintiff with a six-month prescription for muscle relaxants (Robaxin) and pain medication (Ultram). *Id.*

### June 2017 to the Present – Tripp's Refusal to Dispense Neurontin as Prescribed

Plaintiff has been prescribed the drug Neurontin, to be taken three times a day. (Doc. 11, p. 16). If he doesn't take the drug as prescribed, it is not effective and he is in severe pain. *Id.* Unlike Ibuprofen, Plaintiff is not allowed to keep Neurontin in his cell. *Id.* Instead, it must be

delivered by medical personnel as needed. On or about June 8, 2017, Tripp began refusing to provide Plaintiff with his Neurontin prescription (with a single exception). When Plaintiff confronted Tripp about repeated incidents of forgetting his Neurontin prescription, she stated "I didn't forget. I told you about writing grievances and you didn't stop – you actually wrote more grievances. If I have it my way you will never get your medication." *Id.* Because of Tripp's conduct, Plaintiff has been missing doses of Neurontin. *Id.*

### *Medical Treatment from Trost*

Dr. Trost referred Plaintiff to an outside specialist (Dr. Miller) for a consultation regarding a hip replacement. (Doc. `1, p. 17). Plaintiff saw Dr. Miller on April 8, 2016. *Id.* The prison did not receive Dr. Miller's treatment plan until October 2016. *Id.* Dr. Miller's treatment plan included the following recommendations:

- Take 15 mg of Mobic, daily.

- Physical therapy stretching and mobilization of hips.

   Plaintiff is not a very good candidate for any type of because of his weight. In addition it would be difficult – though not impossible – to recover from such a surgery while Plaintiff is incarcerated.

- Plaintiff would be seen again by Dr. Miller if referred by prison officials. However, if Plaintiff experienced additional issues he should be seen for follow-up.

(Doc. 11, pp. 17-18; Doc. 11-1, pp. 3-5). After Dr. Trost reviewed the treatment plan, he made the following statement:

   What the hell does he mean while you are incarcerated. You have a life sentence, let me tell you flat out you have severe hip disease coupled with hip dysplasia. You can barely walk. Physical exercise therapy would only help you if you had mild or moderate DJD in terms of stabilizing your hip and hopefully preventing your DJD from advancing to severe. You need replacement surgery. With your size it's not going to be long before your hip starts slipping, catching and spasming and you have not felt that kind of pain yet…You'll start to shift more weight to your left side where you also have DJD in your hip and knee which will

cause you to need both of your hips to be replaced. The records I supplied Dr. Miller demonstrates you recently had edema all the way down to your toes were so swollen that you could not even tie up your shoes. Thompson, I'm not ordering physical therapy for you.

(Doc. 11, p. 18).

Trost did not refer Plaintiff for physical therapy. (Doc. 11, pp. 18-19). Plaintiff believes that physical therapy would have lessened his pain and would have helped him to lose weight. (Doc. 11, p. 19). His condition has deteriorated as a result of the lack of physical therapy. *Id.* Plaintiff has experienced "slipping, catching, and popping." *Id.* This is causing severe pain. *Id.* Plaintiff has also fallen due to the issues with his hip. *Id.* Plaintiff is experiencing severe spasms and, as a result, has urinated and defecated on himself. *Id.*

In January 2017,[2] after his emergency visit to the HCU, Plaintiff saw Trost for a follow-up visit. *Id.* Plaintiff explained his deteriorating condition. *Id.* Trost responded, "Yes, I know. I told you this would happen." *Id.* Plaintiff asked Trost why he failed to refer Plaintiff for physical therapy, seek a second opinion or send Plaintiff back to Dr. Miller. (Doc. 11, p. 20). Trost indicated that he did not want to look like a "buffoon" by sending Plaintiff back to Dr. Miller too soon. *Id.* He stated that he would send Plaintiff back to Dr. Miller in April 2017- at the one year mark. *Id.* Plaintiff complained that he would have to suffer while waiting for the referral. *Id.* Trost told Plaintiff that he should blame Dr. Miller. *Id*

At the same visit, Trost issued a medical lay-in directive, prohibiting Plaintiff from leaving his cell unless summoned by medical staff. (Doc. 11, pp. 19-22). Plaintiff complained that  was the equivalent of placing him in disciplinary segregation. (Doc. 11, p. 22). Trost

---

[2] The Second Amended Complaint states that the follow-up visit was in January 2016. (Doc. 11, p. 19). However, it appears the follow-up visit was actually in January 2017. Plaintiff indicates that the follow-up visit was after his emergency trip to the HCU, which was in December 2016. (Doc. 11, pp. 12, 19). Additionally, Plaintiff could not have had a follow-up visit regarding the specialist's treatment plan in January 2016 – he did not see the specialist until April 2016.

responded, "yeah[,] I know[.] [Y]ou need to think about these things before you start filing lawsuits and writing all the grievances you constantly write." *Id.* Plaintiff also told Trost that Thompson was retaliating against him for filing lawsuits and grievances. *Id.* In response, Trost said, "Yes, I know Thompson. [A]s you can see[,] I have very loyal followers." *Id.* Plaintiff asked Trost about looking into Thompson's conduct. *Id.* Trost responded, "I'm going to just tell you, the best thing you can do for yourself at this point is to stop writing grievances and filing lawsuits because even when you think your [sic] winning, your [sic] really not." *Id.*

Trost is no longer employed by Menard. (Doc. 11, pp. 20-21). After Trost left Menard, a new physician submitted a second hip replacement referral for Plaintiff. (Doc. 11, p. 20). Dr. Ritz of Wexford denied that request. *Id.* Instead, in August 2017, Plaintiff was referred for physical therapy. (Doc. 11, pp. 20-21). When Plaintiff first met with the physical therapist, the physical therapist asked why Plaintiff's physical therapy had been delayed for over a year. (Doc. 11, p. 21). Plaintiff explained that Trost believed physical therapy would not help Plaintiff. *Id.* The physical therapist disagreed and suggested that Trost should have complied with Dr. Miller's directives.

### Claim Settlement Claim

Plaintiff contends that he entered into a settlement agreement with Trost in *Thompson v. IDOC*. (Doc. 11, p. 23).[3] According to Plaintiff, Trost improperly coerced him to settle and/or breached the settlement agreement. *Id.* Plaintiff contends that Trost's conduct in relation to the settlement agreement was illegal. *Id.*

### Claim Directed at the Outside Specialist – Dr. Miller

---

[3] On September 12, 2016, Plaintiff filed a voluntary motion to dismiss, with prejudice, defendants Trost and Wexford. *See Thompson v. IDOC*, Doc. 89. The motion indicated that a settlement had been reached. *Id.* The motion was granted on September 20, 2016. *See Thompson v. IDOC*, Doc. 91 (granting dismissal of Trost with prejudice pursuant to Rule 41(a)(2)).

Plaintiff contends that Dr. Miller, the outside specialist, delayed forwarding his notes and treatment plan to prison physicians. (Doc. 11, pp. 23-24). Plaintiff asserts that Miller's failure to send this material in a timely manner worsened Plaintiff's condition (because it delayed his treatment) and amounts to deliberate indifference. (Doc. 11, p. 24).

### *Discovery Claim Directed at Defendant Hoffman*

Plaintiff asserts that he does not intend to pursue any claims against Hoffman. (Doc. 1, p. 15). Instead, he has named Hoffman as a defendant for the purpose of obtaining discovery from him. *Id.*

## PRELIMINARY DISMISSALS

### *Dismissal of Claims Directed Against Dr. Miller*

Plaintiff attempts to bring a deliberate indifference claim against Dr. Miller, a private physician who examined Plaintiff on a single occasion in April 2016. To state a claim pursuant to 42 U.S.C. § 1983, a plaintiff must establish that a person acting under color of state law violated his constitutional rights. *See West v. Atkins*, 487 U.S. 42, 49 (1988). Plaintiff cannot proceed with a federal claim under § 1983 against a non-state actor. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999). The Seventh Circuit has emphasized that "[t]his requirement is an important statutory element because it sets the line of demarcation between those matters that are properly federal and those matters that must be left to the remedies of state tort law." *Rodriguez*, 577 F.3d at 822-23 (citing *Am. Mfrs. Mut. Ins. Co*., 526 U.S. at 50; *Jackson v. Metro. Edison Co*., 419 U.S. 345, 349-51 (1974)). Whether Dr. Miller is considered a "state actor" is thus the key factor at this stage in determining whether Plaintiff can proceed with an Eighth Amendment claim against him in federal court. *Rodriguez* 577 F.3d at 822-30.

The Supreme Court and Seventh Circuit have offered district courts guidance in determining when nongovernmental health care providers that serve prisoners qualify as state actors. *Rodriguez*, 577 F.3d at 822-29. The focus of the court's analysis is on the particular function of the medical provider "in the fulfillment of the state's obligation to provide health care to incarcerated persons." *Id*. at 825. Under the public function test, district courts must consider the relationship between the state, the health care provider, and the prisoner. *Id*. at 826. When a physician is employed by the state to provide medical services to state prison inmates, for example, that physician is considered a "state actor" whose conduct is "fairly attributable to the State." *Id*. at 824 (quoting *West*, 487 U.S. at 54). A contractual relationship between the state and the health care provider, although not determinative, is "an important factor in determining whether the private health care provider has entered into its relationship with the state and the prisoner on a voluntary basis." *Id*. at 827. If so, the private provider accepts responsibility to perform duties "in conformity with the Constitution." *Id*.

In addition, district courts consider the relationship between the provider and the inmate. To qualify as a state actor, the physician's relationship with the inmate must be direct, not attenuated. *Id*. at 828. An "incidental and transitory relationship with the state's penal system" or the prisoner is generally not considered voluntary. *Id*.

The Second Amended Complaint includes no allegations suggesting that Dr. Miller was a "state actor" who is subject to suit under § 1983. Dr. Miller is described an orthopedic surgeon employed by the Orthopedic Institute of Southern Illinois. (Doc. 9, p. 2; Doc. 11, pp. 17-24). Defendant Dr. Trost referred Plaintiff to Dr. Miller for an outside consultation regarding Plaintiff's hip condition. Plaintiff mentions nothing about a contractual relationship between Dr.

Miller and the state. Further, his relationship with this doctor appears to be transitory in nature – Plaintiff saw Dr. Miller on only one occasion in April 2016. (Doc. 11, pp. 17-24).

Absent allegations indicating that Dr. Miller is a "state actor" for purposes of § 1983, he is subject to dismissal. Accordingly, Dr. Miller and any claims directed against him shall be **DISMISSED** from the Complaint **without prejudice**.

### *Dismissal of Jacqueline Lashbrook in her Individual Capacity*

Plaintiff identifies Lashbrook, Menard's warden, as a defendant in the caption of his Second Amended Complaint. However, Plaintiff does not direct any claims against Lashbrook. The only allegation involving Lashbrook is that she left employment at Menard and returned in 2016 as Menard's warden. According to the Second Amended Complaint, Lashbrook's return to Menard somehow caused Trost to violate his settlement agreement. This allegation does not present a viable constitutional claim as to Lashbrook in her individual capacity.

Accordingly, to the extent that Plaintiff intended to sue Lashbrook in her individual capacity, the claim is **DISMISSED without prejudice**. However, as is set forth below, Lashbrook shall remain in the action – in her official capacity – for purposes of addressing any injunctive relief that might be granted and responding to discovery directed at identifying Jane Doe (the unidentified nurse).

### *Dismissal of Correctional Officer Hoffman*

Plaintiff identifies Hoffman, a correctional officer, as a defendant in the caption of his Second Amended Complaint. However, in the body of the Second Amended Complaint, Plaintiff states that he is not asserting any claims against Hoffman. Instead, he has included Hoffman as a defendant for discovery purposes. In essence, Plaintiff seeks to name Hoffman as a respondent in discovery. However, Plaintiff may not proceed against Hoffman as a respondent in discovery

because that proceeding is a creature of state court rules and is unknown to the federal rules. [4] The federal rules provide other mechanisms for obtaining discovery from a non-party. After surviving claims are referred for further review, the Magistrate Judge will set guidelines for discovery, including discovery from non-parties such as Hoffman. Accordingly, Hoffman shall be **DISMISSED** from this action **without prejudice**.

## MERITS REVIEW

Based on the allegations of the Second Amended Complaint and Plaintiff's articulation of his claims, the Court finds it convenient to divide the *pro se* action into the following counts. Any other claim that is mentioned in the Second Amended Complaint but not addressed in this Order is dismissed without prejudice as inadequately pled under the *Twombly* pleading standard.

| | |
|---|---|
| **Count 1 –** | Eighth Amendment claim against Jane Doe, Tripp and Thompson for exhibiting deliberate indifference to Plaintiff's serious medical condition (DJD and associated symptoms) on or about December 2016. |
| **Count 2 –** | Eighth Amendment claim against Thompson for exhibiting deliberate indifference to Plaintiff's serious medical condition (DJD and associated symptoms) by refusing to provide Plaintiff with pain medication on or about February 29, 2016. |
| **Count 3 –** | Eighth Amendment claim against Tripp for exhibiting deliberate indifference to Plaintiff's serious medical condition (DJD and associated symptoms) by refusing to provide Plaintiff with his Neurontin prescription, beginning on or about June 8, 2017. |
| **Count 4 –** | Eighth Amendment claim against Trost for exhibiting deliberate indifference to Plaintiff's serious medical condition (DJD and associated symptoms) by failing to refer Plaintiff to physical therapy and/or failing to refer |

---

[4] " 'Respondents in discovery' are creatures of a special provision of Illinois law that permits a plaintiff to seek no relief other than the possible provision of information relevant to plaintiff's underlying substantive claims." *Wisniewski v. City of Chicago*, 1998 WL 895746, *1 n. 1 (N.D.Ill.1998).

|              |                                                                                                        |
|--------------|--------------------------------------------------------------------------------------------------------|
|              | Plaintiff for a second evaluation with the outside specialist in a timely manner.                       |
| **Count 5 –** | First Amendment retaliation claim against Tripp, Thompson and Trost for retaliatory conduct in 2016 and 2017 motivated by Plaintiff's civil lawsuits and grievances. |
| **Count 6 –** | Eighth Amendment cruel and unusual punishment claim against Thompson for antagonizing Plaintiff about his weight and history of filing lawsuits. |
| **Count 7 –** | Claim pertaining to settlement agreement as to Trost.                                                   |

### *Count 1 – Deliberate Indifference – Jane Doe, Tripp and Thompson (December 2016)*

A prisoner who wishes to bring a claim against state officials under the Eighth Amendment must show that (1) he suffered from a sufficiently serious medical condition (i.e., an objective standard) and (2) state officials exhibited deliberate indifference to his medical needs (i.e., a subjective standard). *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001). Here, Plaintiff suffers from DJD in his shoulders, knees, hip and spine. In December 2016, his condition significantly deteriorated. He was in severe pain, was experiencing spasms and was unable to control his bowel movements and bladder. Plaintiff's DJD diagnosis and related symptoms qualify as a serious medical condition. *See Norfleet v. Webster*, 439 F.3d 392 394-95 (7th Cir. 2006); *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997); *Gutierrez*, 111 F.3d at 1372 n.7.

The Second Amended Complaint also sufficiently alleges that Defendants Jane Doe, Tripp and Thompson acted with deliberate indifference to Plaintiff's condition by denying or delaying medical care. These individuals were aware of Plaintiff's medical condition, observed Plaintiff's suffering and physical deterioration, but failed to provide him with medical care. As a result, Plaintiff suffered needlessly for two or three weeks. The Second Amended Complaint also

suggests that the decision to deny and/or delay medical care was for an array of nonmedical reasons. As such, these allegations sufficiently state a claim for deliberate indifference. *See Diaz v. Godinez,* 693 F. App'x 440 (7th Cir. 2017) (turning a blind eye to readily treatable pain can constitute deliberate indifference); *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015) (a delay in treatment may constitute deliberate indifference if it exacerbates the inmate's injury or unnecessarily prolongs his pain); *Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007) (failing to provide adequate, timely care for a nonmedical reason suggests deliberate indifference).

For these reasons, Count 1 shall receive further review as to Defendants Jane Doe, Tripp and Thompson.

### Count 2 – Deliberate Indifference – Thompson (February 29, 2016)

On February 29, 2016, Plaintiff's appointment with Trost was cancelled and he was unable to obtain his ibuprofen refill (prescribed to treat the pain associated with Plaintiff's severe DJD). Plaintiff sought assistance from Thompson, but she refused to intervene for nonmedical reasons. As a result, Plaintiff was without his medication for several days, causing significant pain. At this stage in the litigation, these allegations are sufficient to state a claim for deliberate indifference as to Thompson. *See Diaz v. Godinez,* 693 F. App'x 440 (7th Cir. 2017); *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015); *Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007).

Accordingly, Count 2 shall receive further review as to Thompson.

### Count 3 – Deliberate Indifference – Tripp (Neurontin Prescription)

Plaintiff has been prescribed Neurontin to treat his DJD and associated pain. The prescription must be taken three times a day and must be taken as prescribed or it loses its effectiveness (a certain amount of the drug needs to build up in the patient's system). Unlike

ibuprofen, inmates are not allowed to keep a supply of Neurontin in their cells. Rather, the drug must be delivered by staff as needed.

On or about June 8, 2017, Tripp began refusing to provide Plaintiff with his prescribed medication, causing Plaintiff to suffer in pain. Tripp indicated that she would not be providing the medication because of Plaintiff's many grievances (*i.e.* for a non-medical reason). These allegations are sufficient to state a claim for deliberate indifference as to Tripp at this juncture. *See Diaz v. Godinez,* 693 F. App'x 440 (7th Cir. 2017); *Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015); *Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007).

Accordingly, Count 3 shall receive further review.

### Count 4 – Deliberate Indifference – Trost

In April 2016, Trost referred Plaintiff to an outside specialist. The outside specialist recommended physical therapy. He also indicated that Plaintiff should return for a second evaluation if he experienced additional issues. After receiving the specialist's recommendations, Trost refused to refer Plaintiff to physical therapy. Further, when Plaintiff's condition significantly deteriorated (resulting in severe pain), Trost delayed contacting the specialist because he did not want to "look like a buffoon."

"Simple differences of opinion among medical personnel or between the inmate and his prison doctors concerning what is appropriate treatment do not constitute deliberate indifference." *Edrano v. Smith,* 161 F. App'x 596, 599 (7th Cir. 2006) (citing *Gil v. Reed*, 381 F.3d 649, 663 (7th Cir. 2004)). However, a prison doctor's failure to follow directions issued by an outside specialist is sufficient to raise an inference of deliberate indifference. *Id.* (citing *Gil,* 381 F.3d at 663-64; *Jones v. Simek,* 193 F.3d 485, 490-91 (7th Cir. 1999). Further factual

development is necessary to determine whether Trost's refusal to refer Plaintiff for physical therapy amounted to unconstitutional deliberate indifference or a mere difference of opinion.

Additionally, the Second Amended Complaint suggests that Trost did not provide adequate, timely care for a nonmedical reason (he did not want to "look like a buffoon."). This delay in treatment may have worsened Plaintiff's condition and/or inflicted unnecessary pain. Such allegations are sufficient, at the pleading stage to state a claim for deliberate indifference. *See Diaz v. Godinez,* 693 F. App'x 440 (7th Cir. 2017); *Perez v. Fenoglio*, 792 F.3d 768, 782 (7th Cir. 2015); *Edwards v. Snyder*, 478 F.3d 827, 830 (7th Cir. 2007).

For these reasons, Count 4 shall receive further review as to Trost.

### Count 5 – Retaliation – Tripp, Thompson and Trost

Prison officials may not retaliate against inmates for filing grievances or otherwise complaining about their conditions of confinement. *See, e.g., Gomez v. Randle*, 680 F.3d 859, 866 (7th Cir. 2012); *Walker v. Thompson*, 288 F.3d 1005 (7th Cir. 2002); *DeWalt*, 224 F.3d 607; *Babcock v. White*, 102 F.3d 267 (7th Cir. 1996); *Cain v. Lane*, 857 F.2d 1139 (7th Cir. 1988). To establish a First Amendment claim for retaliation, an inmate must allege "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was at least a motivating factor in the defendants' decision to take the retaliatory action." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009).

Plaintiff's Second Amended Complaint sufficiently alleges that, between 2016 and 2017, Tripp, Thompson and Trost retaliated against Plaintiff for engaging in protected First Amendment activity (filing grievances and lawsuits). The claims pertaining to each defendant's alleged involvement in the retaliatory conduct is discussed below.

**Tripp**

In December 2016, as Plaintiff's condition was deteriorating, he asked Tripp to refer him to the HCU and/or to give him ibuprofen. (Doc. 11, pp. 9-10). Initially, Tripp indicated that Plaintiff could not be referred to the HCU because employees were busy attending a series of Christmas parties. (Doc. 11, p. 9). She agreed to bring Plaintiff ibuprofen later in the day. *Id.* However, when she returned, she stated that she had forgotten and was too tired to make another trip. (Doc. 11, p. 10). When Plaintiff told Tripp she was his last hope and made a critical comment regarding the Christmas parties, she responded, "I did not tell you to file those lawsuits or to insult me just now, did I[?] It seems the suits you filed are coming back to bite you in the ass huh[?]" *Id*…"You need to stop with the grievances and lawsuits because I or no one else is ever going to help you." *Id.*

On or about June 8, 2017, Tripp began refusing to provide Plaintiff with his Neurontin prescription. (Doc. 11, p. 16). When Plaintiff confronted Tripp about repeated incidents of forgetting his prescription, she stated, "I didn't forget. I told you about writing grievances and you didn't stop – you actually wrote more grievances. If I have it my way you will never get your medication." *Id*.

The allegations described above suggest that Tripp's conduct (denying Plaintiff medical care and refusing to provide prescribed medication) was motivated by retaliatory animus.

**Thompson**

On February 29, 2016, Plaintiff was unable to obtain an ibuprofen refill because his appointment with Dr. Trost was cancelled. (Doc. 11, p. 12). When Plaintiff asked Thompson for ibuprofen, Thompson refused stating, "Tell me why I should go out of my way to give you

anything when Dr. Trost is like the third medical staff member you have sued…I'm not giving you nothing." *Id.*

In December 2016, when Plaintiff's condition was significantly deteriorating, Thompson refused to provide him with medical treatment and refused to refer him to the HCU. (Doc. 11, pp. 7-10). She told Plaintiff, "You know I'm not doing that for you …you need to think about these things before you start suing the very people you need to give you treatment especially the way you're breaking down." (Doc. 11, p. 9). She also declined to give Plaintiff pain medication and turned to the officer that called her down and stated, "I wish you had told me it was this fucker who be suing everybody was the prisoner in distress before I walked downstairs to his cell…that's all his fat ass does is sit around and file grievances and suits on the staff I'm not giving him shit." *Id*.

Finally, Plaintiff contends that Thompson harassed him (from February 2016 until she left her employment with Menard). (Doc. 11, p. 14). The Court has concluded that Thompson's alleged harassment does not state an independent claim for cruel and unusual punishment (*see* Count 6, *infra*). However, the allegations described above suggest that Thompson's decision to deny Plaintiff's requests for medical treatment, as well as her ongoing harassment of Plaintiff were motivated by retaliatory animus.

**<u>Trost</u>**

On January 9, 2017,[5] Trost issued a medical lay-in directive, prohibiting Plaintiff from leaving his cell unless summoned by medical staff. (Doc. 11, pp. 19-22). Plaintiff complained that it was the equivalent of placing him in disciplinary segregation. (Doc. 11, p. 22). Trost responded, "Yeah[,] I know[.] [Y]ou need to think about these things before you start filing

---

[5] As previously noted, the Second Amended Complaint actually states this visit occurred on January 9, 2016. However, this appears to be a scrivener's error. As, Plaintiff states the January appointment with Trost was scheduled because of his emergency trip to the HCU in December 2016. (Doc. 11, p. 19).

lawsuits and writing all the grievances you constantly write." *Id.* During the visit on January 9, 2017, Plaintiff also told Trost that Thompson was retaliating against him for filing lawsuits and grievances. *Id.* In response, Trost stated, "Yes, I know Thompson. [A]s you can see[,] I have very loyal followers." *Id.* Plaintiff asked Trost about looking into Thompson's conduct. *Id.* Trost said, "I'm going to just tell you, the best thing you can do for yourself at this point is to stop writing grievances and filing lawsuits because even when you think your [sic] winning, your [sic] really not." *Id.*

The above allegations suggest that the medical lay-in directive may have been motivated by retaliatory animus. It also suggests that (1) Trost facilitated, condoned or turned a blind eye to Thompson's acts of retaliation and that (2) Trost's action (or inaction) with regard to Thompson's conduct was motivated by retaliatory animus.

## Summary

Plaintiff has alleged that he engaged in protected activity (filing grievances and civil rights lawsuits). He has also alleged that (1) Tripp withheld medical treatment because Plaintiff engaged in that protected activity; (2) Thompson withheld medical treatment and harassed Plaintiff because he engaged in that protected activity; and (3) Trost issued a medical lay-in directive and/or facilitated, condoned or turned a blind eye to Thompson's conduct because Plaintiff engaged in that protected activity (*i.e.* Trost's action and inaction were motivated by retaliatory animus). These allegations suffice to state a claim for retaliation. *See Perez v. Fenoglio,* 792 F.3d 768, 783 (7th Cir. 2015) ("[W]e have held that denial of medical treatment is a deprivation likely to dissuade a reasonable person from engaging in future First Amendment activity.") (citing *Murphy v. Lane,* 833 F.2d 106, 108 (7th Cir.1987).

### Count 6 – Cruel and Unusual Punishment – Thompson

The Eighth Amendment prohibits cruel and unusual punishment. In the past, the Seventh Circuit has indicated that "simple verbal harassment," standing alone, does not constitute cruel and unusual punishment. *Id*. *See also Dobbey v. Ill. Dep't of Corrections*, 574 F.3d 443, 446 (7th Cir. 2009) ("[H]arassment, while regrettable, is not what comes to mind when one thinks of 'cruel and unusual' punishment."). More recently however, the Seventh Circuit has clarified that "simple," when used to describe verbal harassment in this context, is an inaccurate term. *Beal v. Foster*, 803 F.3d 356, 357-58 (7th Cir. 2015) (citing *DeWalt*, 224 F.3d at 612). "[W]hat is meant is 'fleeting,' too limited to have an impact." *Beal*, 803 F.3d at 357. Thus, under certain circumstances, verbal harassment may support an Eighth Amendment claim. *Id.* at 357-58.

Factors that are relevant in determining whether verbal harassment states a constitutional claim include (1) whether the conduct was fleeting (too limited to have an impact); (2) whether the harassment was accompanied by other physical or intimidating actions; (3) whether the harassment was directed at the plaintiff (as opposed to secondary harassment); (4) whether the harassment caused physical pain or severe psychological trauma; and/or (5) whether the harassment placed the plaintiff at greater risk of assault by other prisoners.

Here, Plaintiff alleges that Thompson verbally harassed him on a regular basis. Specifically, Plaintiff claims that Thompson made derogatory comments about his weight and antagonized him for filing grievances and lawsuits. Although Thompson's alleged conduct was inappropriate and unprofessional, it does not rise to the level of being unconstitutional.

Accordingly, Count 6 shall be **DISMISSED without prejudice** for failure to state a claim.

### *Count 7 – Settlement Agreement – Trost*

Plaintiff contends he entered into a settlement agreement with Trost in *Thompson v. IDOC*. (Doc. 11, p. 23).[6] According to Plaintiff, Trost improperly coerced him to settle and/or breached the settlement agreement. *Id.* To the extent that Plaintiff seeks to challenge or enforce the settlement agreement, he should do so under the same cause number in which the settlement was reached. Accordingly, Count 7 shall be **DISMISSED with prejudice**.

### REQUEST FOR PRELIMINARY INJUNCTION

A request for a preliminary injunction is imbedded in the middle of the Second Amended Complaint. (Doc. 11, pp. 16-17). Plaintiff asks the Court to issue a "preliminary injunction" against Tripp ordering her to stop withholding his prescription medications. *Id.* Plaintiff has not filed a separate motion for a preliminary injunction. Nevertheless, the Clerk is **DIRECTED** to add a motion for a preliminary injunction to the docket. The motion is referred to United States Magistrate Judge Reona J. Daly for prompt disposition.

With respect to Plaintiff's request for a preliminary injunction and any other injunctive relief that might be granted at the close of the case, the warden is the appropriate party. *Gonzales v. Feinerman*, 663 F.3d 311, 315 (7th Cir. 2011). Accordingly, Jacqueline Lashbrook, the current warden of Menard, shall remain in the case – in her official capacity – for purposes of carrying out any injunctive relief that may be ordered.

### IDENTIFICATION OF UNKNOWN DEFENDANT

Plaintiff shall be allowed to proceed against Jane Doe (prison nurse, "part of her name is Marsha"). However, this defendant must be identified with particularity before service of the

---

[6] On September 12, 2016, Plaintiff filed a voluntary motion to dismiss, with prejudice, defendants Trost and Wexford. *See* pending *Thompson v. IDOC* , Doc. 89. The motion indicated a settlement had been reached. *Id.* The motion was granted on September 20, 2016. *See* pending NJR action, Doc. 91 (granting dismissal of Trost with prejudice pursuant to Rule 41(a)(2)).

Second Amended Complaint can be made on her. Where a prisoner's Complaint states specific allegations describing conduct of individual prison staff members sufficient to raise a constitutional claim, but the names of those defendants are not known, the prisoner should have the opportunity to engage in limited discovery to ascertain the identity of those defendants. *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 832 (7th Cir. 2009). Guidelines for discovery will be set by the United States Magistrate Judge. Once Jane Doe's name is discovered, Plaintiff shall file a motion to substitute the newly identified defendant in place of the generic designation in the case caption and throughout the Complaint.

Lashbrook, Menard's current warden, who is already an official capacity defendant, will be responsible for responding to discovery (informal or formal) aimed at identifying this unknown defendant.

## DISPOSITION

The Clerk of the Court is **DIRECTED** to **ADD** a Motion for Preliminary Injunction as a separate docket entry in CM/ECF (based on the allegations in Doc. 11, pp. 16-17). This motion is hereby **REFERRED** to United States Magistrate Judge Daly for prompt disposition.

The Clerk of the Court is **DIRECTED** to **TERMINATE** Plaintiff's Motion to Stay (Doc. 7) as **MOOT**.

**IT IS HEREBY ORDERED** that **COUNT 1** shall receive further review as to **JANE DOE, TRIPP** and **THOMPSON. COUNT 2** shall receive further review as to **THOMPSON. COUNT 3** shall receive further review as to **TRIPP. COUNT 4** shall receive further review as to **TROST. COUNT 5** shall receive further review as to **TRIPP, THOMPSON** and **TROST.**

**IT IS FURTHER ORDERED** that **COUNT 6** is **DISMISSED** without prejudice for failure to state a claim upon which relief can be granted. **COUNT** 7 is **DISMISSED** with

prejudice because the settlement claim must be brought, if at all, in *Thompson v. Illinois Department of Corrections et al.,* 3:15-cv-850-NJR-DGW.

**IT IS FURTHER ORDERED** that **MILLER** is **DISMISSED** from this action without prejudice because the Second Amended Complaint does not indicate that he was a state actor. The Clerk of the Court is **DIRECTED** to **TERMINATE MILLER** as a party in CM/ECF.

**IT IS FURTHER ORDERED** that any individual capacity claims against **LASHBROOK** are **DISMISSED** without prejudice for failure to state a claim upon which relief can be granted. **LASHBROOK**, however, shall remain a defendant – in her official capacity – for purposes of responding to discovery directed at identifying Jane Doe and for addressing any injunctive relief that might be granted.

**IT IS FURTHER ORDERED** that Plaintiff may not proceed against **HOFFMAN** as a respondent in discovery. Accordingly, **HOFFMAN** is **DISMISSED** from this action without prejudice. The Clerk of the Court is **DIRECTED** to **TERMINATE HOFFMAN** as a party in CM/ECF.

**IT IS FURTHER ORDERED** that the Clerk of Court shall prepare for **THOMPSON, TRIPP, LASHBROOK** (official capacity only), and **TROST**: (1) Form 5 (Notice of a Lawsuit and Request to Waive Service of a Summons), and (2) Form 6 (Waiver of Service of Summons). The Clerk is **DIRECTED** to mail these forms, a copy of the Complaint, and this Memorandum and Order to each Defendant's place of employment as identified by Plaintiff. If a Defendant fails to sign and return the Waiver of Service of Summons (Form 6) to the Clerk within 30 days from the date the forms were sent, the Clerk shall take appropriate steps to effect formal service on that Defendant, and the Court will require that Defendant to pay the full costs of formal service, to the extent authorized by the Federal Rules of Civil Procedure.

With respect to a Defendant who no longer can be found at the work address provided by Plaintiff, the employer shall furnish the Clerk with the Defendant's current work address, or, if not known, the Defendant's last-known address. This information shall be used only for sending the forms as directed above or for formally effecting service. Any documentation of the address shall be retained only by the Clerk. Address information shall not be maintained in the court file or disclosed by the Clerk.

Defendant is **ORDERED** to timely file an appropriate responsive pleading to the Complaint and shall not waive filing a reply pursuant to 42 U.S.C. § 1997e(g).

Pursuant to Local Rule 72.1(a)(2), this action is **REFERRED** to United States Magistrate Judge **Reona J. Daly** for further pre-trial proceedings, including Plaintiff's Motion for Preliminary Injunction (to be added to the docket). Further, this entire matter shall be **REFERRED** to United States Magistrate Judge **Daly** for disposition, pursuant to Local Rule 72.2(b)(2) and 28 U.S.C. § 636(c), *if all parties consent to such a referral.*

If judgment is rendered against Plaintiff, and the judgment includes the payment of costs under § 1915, Plaintiff will be required to pay the full amount of the costs, regardless of whether his application to proceed *in forma pauperis* is granted. *See* 28 U.S.C. § 1915(f)(2)(A).

Plaintiff is **ADVISED** that at the time application was made under 28 U.S.C. § 1915 for leave to commence this civil action without being required to prepay fees and costs or give security for the same, the applicant and his or her attorney were deemed to have entered into a stipulation that the recovery, if any, secured in the action shall be paid to the Clerk of the Court, who shall pay therefrom all unpaid costs taxed against plaintiff and remit the balance to plaintiff. Local Rule 3.1(c)(1).

Finally, Plaintiff is **ADVISED** that he is under a continuing obligation to keep the

Clerk of Court and each opposing party informed of any change in his address; the Court will not independently investigate his whereabouts. This shall be done in writing and not later than **7 days** after a transfer or other change in address occurs. Failure to comply with this order will cause a delay in the transmission of court documents and may result in dismissal of this action for want of prosecution. *See* FED. R. CIV. P. 41(b).

**IT IS SO ORDERED.**

**DATED:  October 30, 2017**

<u>**s/ STACI M. YANDLE**</u>
**Staci M. Yandle**
**United States District Judge**